**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

VINITA H. SANKEY,

Defendant - Appellant.

No. 10-6158

(W.D. Oklahoma)

(D.C. No. 5:08-CR-00294-C-2)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **BRORBY,** Senior Judge, and **TYMKOVICH**, Circuit Judges.

---

**I. Introduction**

Vinita Helen Sankey appeals her conviction of eleven counts of embezzlement and theft from an Indian tribal organization in violation of 18 U.S.C. § 1163 and her resulting sentence. She argues there was insufficient evidence to support the convictions, and that the district court erred in calculating the amount of loss for the purposes of sentencing, including restitution. Exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, this

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

court **AFFIRMS** the judgment of conviction and **AFFIRMS** the sentence except as to restitution. The order of restitution is **REVERSED** and the matter is **REMANDED** for resentencing only as to restitution.

## II.  Background

Sankey was jointly tried with her co-defendant and husband, William Blind, and raises similar issues on appeal. The background facts, including the evidence introduced at trial, are more fully set forth in this court's opinion in *United States v. Blind*, No. 10-6159. Briefly, Sankey and Blind, elected tribal officials in the Cheyenne and Arapaho Tribes ("Tribes"), were indicted on conspiracy and embezzlement charges. Count One of the indictment charged Sankey and her husband with conspiracy to embezzle tribal monies. Counts Seven through Fourteen charged Sankey with embezzling tribal funds by engaging in the practice of negotiating cashier's checks intended for her district by depositing only a portion of each check into the district's account and receiving a portion back in cash. Counts Fifteen through Seventeen charged Sankey with embezzling tribal funds by taking advances on tribal gaming revenues intended for her district and retaining the funds in cash or depositing them into her personal bank account. Counts Eighteen and Twenty through Twenty-Six charged Sankey with purchasing various items with tribal funds and failing to return them to the Tribes or to reimburse the Tribes. These items included automobiles, a riding lawn mower, computer equipment, and portable storage buildings.

The jury convicted Sankey on all counts in the indictment. A Presentence Report ("PSR") was prepared and it calculated the amount of loss attributed to Sankey's conduct as $230,086.82. Sankey objected to some of the items included in that total and the district court addressed the objections at the sentencing hearing. The court overruled some of Sankey's objections and sustained others, ultimately reducing the loss amount for guidelines calculation purposes to $218,387.82. Based on this amount, Sankey's base offense level of six was increased by twelve levels. *See* USSG § 2B1.1(b)(1)(G). Her total offense level of eighteen and criminal history Category I resulted in an advisory guidelines range of thirty-three to forty-one months. The court sentenced her to forty-one months' imprisonment, the high end of the range. The court also ordered Sankey to pay $193,792.82 in restitution. On appeal, Sankey challenges the sufficiency of the evidence supporting her convictions on Counts Seven through Seventeen. She also challenges the district court's calculation of the loss amounts used to determine her offense level and restitution.

## III. Discussion

### A. Sufficiency of the Evidence

Sankey did not move for a judgment of acquittal at the close of evidence on any of the counts she now challenges. Accordingly, plain error review applies to Sankey's claims of insufficient evidence in this appeal. *See United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007). Under this standard, Sankey has the

burden to show error, that is plain, that affects her substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* A conviction on a count for which there was insufficient evidence will generally meet the four-prong plain error test. *See id.* at 681 n.1 (en banc) ("[A] conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice."). In reviewing whether evidence was sufficient to support a conviction, this court examines whether a rational jury "could have found the defendant guilty beyond a reasonable doubt," viewing the evidence and all reasonable inferences therefrom in the light most favorable to the government. *United States v. Flanders*, 491 F.3d 1197, 1207 (10th Cir. 2007).

### 1. Cashier's Checks

Sankey first challenges her convictions on Counts Seven through Fourteen, which charged her with embezzling money from the Tribes by retaining cash totaling $57,154.11, representing portions of negotiated cashier's checks intended for her district. Sankey argues the government failed to present any evidence that the cash she received was used for anything other than lawful tribal expenditures.

To prove the allegations in these counts, the government presented bank records of the cashier's check transactions. As to Count Seven, the records showed Sankey cashed two cashier's checks payable to "Arapaho District 1 VS" and "Cheyenne-Arapaho Tribes" totaling $82,409.51. Of that, certain sums were

-4-

deposited into her district and payroll accounts, $5,000.00 was deposited into an account for the Barefoot Pow-Wow, and the remainder was used to get a new cashier's check payable to Wal-Mart. In addition, Sankey received $2,500.00 in cash from the checks. As to Count Eight, bank records showed Sankey cashed another cashier's check, also payable to "Arapaho District 1 VS" in the amount of $62,174.00. In exchange, Sankey received a new cashier's check for $22,174.00 and $20,000.00 in cash, and deposited the remainder into her district's payroll account. As to Count Nine, Sankey again cashed a cashier's check payable to her district, this one for $72,777.75, with which she purchased a new cashier's check for $54,977.75 and took $17,800.00 in cash. As to Count Ten, the records showed Sankey negotiated another cashier's check for her district in the amount of $12,727.69, receiving a check payable to the Western Inn Motel for $3,294.00, a new cashier's check for $6,423.69, and $3,000.00 in cash. As to Count Eleven, she negotiated a cashier's check for $6,423.69 intended for her district by depositing $4,023.69 into her district's payroll account and receiving $2,400.00 in cash.

Count Twelve is the first involving a series of transactions with related cashier's checks. As to this count, Sankey negotiated a cashier's check for $17,968.89 for her district, receiving a new cashier's check for $15,507.89, three smaller checks totaling $450.00, and $2,000.00 in cash. As to Count Thirteen, Sankey cashed that new cashier's check for $15,507.89, buying a new cashier's

check for $13,935.02 and several small miscellaneous checks. Several days later, she negotiated the new $13,935.02 check and used it to purchase seventeen miscellaneous checks, a new cashier's check payable to the district in the amount of $5,454.11, and $4,000.00 in cash. Finally, as to Count Fourteen, the records showed Sankey took the entire amount of the $5,454.11 check in cash. As to each count, Sankey was convicted of embezzling the amount she received in cash. The government did not present any direct evidence of how Sankey spent the cash she retained from these transactions.

Sankey argues the government's case was supported only by inference piled upon inference, because no evidence directly showed how the cash was used. Specifically, she contends there was no evidence of any particular extravagant purchases or expenditures on personal items with the cash. She further asserts she was authorized to cash the checks on behalf of her district. Thus, although the evidence showed she received cash, there was no evidence she misappropriated that cash. Further, she points to evidence cash was often used by her district for a variety of legitimate tribal functions, partly because local vendors would no longer take tribal checks. The jury heard testimony that Emergency Assistance ("EA") funds were sometimes given to members of the Tribes in the form of cash or Wal-Mart gift cards so the member would not have to go to the casino to cash a check. Other witnesses testified Sankey's district used cash to pay general office expenses but did a poor job of record-keeping.

-6-

Sankey's sufficiency-of-the-evidence argument fails for the same reasons as did her co-defendant's nearly identical arguments, explained in this court's opinion in *United States v. Blind*, No. 10-6159. As this court noted, circumstantial evidence is sufficient to sustain a conviction. *United States v. Davila*, 693 F.2d 1006, 1007 (10th Cir. 1982). The very same types of circumstantial evidence support Sankey's convictions on these counts as support Blind's convictions stemming from similar cashier's check transactions. Strong circumstantial evidence of embezzlement of the cash was presented to the jury, including the unusual nature of the transactions, the structuring of transactions in an inherently untraceable way, and the circumvention of various policies of the Tribes designed to track funds and prevent misappropriation. *See United States v. Baldridge*, 559 F.3d 1126, 1141 (10th Cir. 2009) (explaining that unusual nature of transactions designed to avoid detection can provide evidence of illegal intent). Like Blind, Sankey maintained an account for district business and used that account for some tribal purposes. Her failure to use the district account for other transactions, particularly those in which she received untraceable cash, permitted the jury to find the cash involved in those transactions were embezzled for personal use. There is additional evidence of Sankey's misappropriation. A portion of the money from the cashier's checks was deposited into an account for the Barefoot Pow-Wow, an event no longer being held. Evidence showed Sankey withdrew cash from the Barefoot Pow-Wow account on various occasions and

used it to pay off her personal loans. The jury could properly consider evidence of Sankey's misuse of the Barefoot Pow-Wow account, into which she deposited funds from the cashier's checks, to support an inference that the cash she retained from the same cashier's checks was embezzled.

Sankey's arguments that the cash was used legitimately because her district distributed EA funds and conducted other office business in cash fail for the same reasons as did Blind's similar arguments. The jury heard ample evidence the EA program guidelines were routinely disregarded in Sankey's district and EA funds were misappropriated. Accordingly, the jury was not compelled to conclude Sankey's use of the cash was legitimate. Finally, Sankey's argument that she was entitled to cash the checks as the Business Committee member representing her district misses the mark. As explained in *Davila*, "because the crime of embezzlement presupposes lawful possession, circumstantial evidence is often the only indicium of . . . intent to convert." 693 F.2d at 1007. Here, the jury could permissibly infer from the evidence presented that Sankey embezzled the cash. That conclusion required the jury to draw only one inference—that the cash was not spent legally—not, as Sankey contends, to pile inference upon inference. Accordingly, there was no error, much less reversible error under the plain error standard.

## 2. Gaming Advances

Sankey next challenges the sufficiency of the evidence supporting her convictions on Counts Fifteen through Seventeen, which charged her with embezzling advances she took from tribal gaming revenues, totaling $8,000.00. These transactions involved money from a tribal account held by the Tax Commission, the central financial agency of the Tribes. Sankey and Blind had access to this account because of their membership on the Business Committee. To prove these allegations, the government introduced Tax Commission records of check transactions and the testimony of a Tax Commission employee. Sankey argues the government failed to prove the advances were not repaid. She contends the single witness who testified about the advances stated there was no way to know how the money was spent and admitted the Tax Commission's records were in disarray.

The evidence as to Sankey's conversion of the gaming advances is sufficient to sustain her convictions on these counts. The Tax Commission employee testified Sankey regularly took "advances" on the revenues she expected to receive from gaming profits for her district, promising to repay those advances in the future. The employee also testified that despite efforts by the Commission to locate documentation of repayment, there was no evidence the money was ever repaid. The employee also authenticated the Tax Commission records. As to Count Fifteen, records showed a check was drawn on the Tax Commission account in the amount of $2,500.00 made out to "Vinita Sankey."

Blind and Sankey signed the check on behalf of the Tax Commission. As to Count Sixteen, records showed an identically addressed check, again signed by Blind and Sankey, in the amount of $3,000.00. Records showed Sankey later deposited that $3,000.00 check into her personal checking account. As to Count Seventeen, records showed a third identically addressed check, again signed by Blind and Sankey, in the amount of $2,500.00. Records also showed this check was later negotiated at a bank, with Sankey depositing $2,000.00 into her personal checking account and taking $500.00 in cash.

The aberrant nature of Sankey's conduct is apparent on its face. Sankey was writing checks to herself out of the Tax Commission's account. Moreover, the money was not deposited in her district's account, but rather taken in cash or deposited directly into Sankey's personal bank account. The extreme irregularity of Sankey's conduct alone is enough to support the jury's finding that she embezzled the cash. The Tax Commission employee's testimony that an exhaustive search for records produced no evidence of repayment only bolstered the government's case. In short, as with the cashier's checks, the government did not have to prove exactly how Sankey spent the money. *See Davila*, 693 F.2d at 1007. Rather, it only had to introduce sufficient evidence to allow a jury to find the money was converted to Sankey's personal use. It clearly did so here.

**B.    Sankey's Sentence and Restitution Order**

Sankey next challenges her sentence as procedurally unreasonable, arguing the district court erred in calculating the total amount of loss, $218,387.82, used to set her offense level under the sentencing guidelines. She further argues the district court erred in calculating the $193,792.82 amount of restitution she was ordered to pay.

### 1. Cashier's Checks and Gaming Advances

Sankey first argues the district court erred by including losses from the cashier's check scheme and the gaming advances, described above, in the guidelines and restitution loss calculations. At sentencing, Sankey objected to the inclusion of these amounts on the basis that the government introduced insufficient evidence to prove the amounts. Her objection was essentially the same as her sufficiency-of-the-evidence argument as to those counts, i.e., the government never showed at trial how the cash was spent and some evidence showed legitimate district business was conducted with cash. Sankey now argues the district court's factual findings as to these losses were inadequate under Fed. R. Crim. P. 32(i)(3)(B) and that there was insufficient evidence to prove the loss amount for sentencing purposes, rendering the district court's inclusion of these losses clearly erroneous.

Although Sankey objected to these loss amounts as stated in the PSR, she never objected to the adequacy of the district court's factual findings at the sentencing hearing. Accordingly, the adequacy of the factual findings is reviewed

-11-

for plain error. *See United States v. Cook*, 550 F.3d 1292, 1297-98 (10th Cir. 2008). Sankey cannot show the district court plainly erred. The loss amounts of which she complains were directly based on the amounts Sankey was convicted of embezzling in Counts Seven through Seventeen. In response to Sankey's objections to the loss amounts, the district court overruled the objections, explaining they were "precluded by the jury's verdict." Because Sankey's objections at sentencing to these loss amounts in essence attacked the sufficiency of the evidence supporting her convictions of embezzling those amounts, the district court's explanation that the jury's verdict established the loss amounts was an adequate explanation.

Sankey's argument that the factual findings themselves were clearly erroneous also fails. Factual findings of loss, when preserved by timely objection below, are reviewed for clear error. *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010) (relating to guidelines calculations); *United States v. James*, 564 F.3d 1237, 1243 (10th Cir. 2009) (relating to restitution). Sankey's argument on appeal is again limited to her assertion the government did not present any evidence of how she spent the cash she received from the various transactions, and thus the evidence was insufficient to support the loss amounts found by the district court. As explained above, however, the government presented sufficient evidence at trial to support her convictions on Counts Seven through Seventeen, including the actual bank records from which it was shown

-12-

Sankey received cash payments and the amounts of those payments. Accordingly, the district court's findings at sentencing, which were applied both to the amount of loss used to calculate Sankey's advisory guidelines range and to the calculation of restitution, are not clearly erroneous.

## 2. Travel Reimbursements

Next, Sankey challenges the inclusion of $11,635.46 in her total loss amount attributed to improper travel reimbursements from four separate trips.[1] The government argues Sankey failed to object to these loss amounts below and thus did not preserve the issue for appeal. The government admits, however, that these loss amounts were erroneously included because the government did not present evidence to support them.

Even assuming Sankey properly objected below, any error is harmless as to the calculation of her advisory guidelines range. *See United States v. Wilken*, 498 F.3d 1160, 1169 (10th Cir. 2007). The district court found Sankey's total loss amount to be $218,387.82; under the guidelines, the same increase in offense level applies to loss amounts between $200,000 and $400,000. *See* USSG § 2B1.1(b)(1). If Sankey's loss amount is reduced by the $11,635.46 of erroneously included travel reimbursements, her total loss amount would be $206,752.36, still

---

[1]The travel reimbursements were listed as pertaining to the National Indian Education Conference, the Bingo World Conference, the National Congress of American Indians, and the Global Gaming Expo.

above the $200,000 cutoff. The error thus did not affect the calculation of Sankey's advisory guidelines range.

Based on the same travel reimbursement allegations, however, the district court ordered Sankey to pay the same amount in restitution. Under the Mandatory Victims Restitution Act, a restitution order that the government concedes exceeds the loss caused by the defendant is an illegal sentence constituting plain error. *James*, 564 F.3d at 1243; *United States v. Smith*, 156 F.3d 1046, 1056 (10th Cir. 1998). Thus, even if Sankey did not preserve her objection to the restitution amount, as the government argues, the inclusion of that amount is plain error because the government concedes it was not supported by any evidence. *See Smith*, 156 F.3d at 1056 (vacating under plain error standard restitution amount as to which government admits it did not present evidence below). Accordingly, the restitution order is reversed as to the $11,635.46 pertaining to the four identified travel reimbursements.

## IV.  Conclusion

For the forgoing reasons, Sankey's convictions are **AFFIRMED**, her sentence is **AFFIRMED** except as to restitution, and the restitution order is **REVERSED**. The matter is **REMANDED** for resentencing as to restitution only.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

-14-